No. 34,503

MONTGOMERY WARD & COMPANY, *Appellant*, v. THE STATE TAX COMMISSION OF THE STATE OF KANSAS, and the Bodies Successor Thereto, the STATE COMMISSION OF REVENUE AND TAXATION, ETC., *Appellees*.

(98 P. 2d 143)

Opinion filed January 27, 1940.

*Robert L. Webb,* of Topeka, *John A. Barr, Harold W. Bancroft* and *Stuart S. Ball,* all of Chicago, Ill., for the appellant.

*Vernon C. Rosenstahl,* of Parsons, *William Gough, Jr.,* of Chanute, and *Mason Mahin,* of Smith Center, for the appellees.

The opinion of the court was delivered by

HOCH, J.: This is an income-tax case. It is here on appeal from an order of the district court sustaining an additional assessment made against the plaintiff company by the state tax commission. The substantive question presented is whether the entire income against which the tax was assessed was "derived from property located and busines transacted within this state," or was in part "derived" from property located and business transacted outside this state. A procedural issue is also raised, the tax commission contending that the company did not comply with the statutory and regulatory requirements in making its returns, that it did not exhaust its administrative remedies and therefore judicial relief is not available to it. The substantive question will be first considered.

It is admitted by appellees that any attempt to tax the income of a nonresident derived from sources outside the state would be unconstitutional and void. (61 C. J. 1561, 1562.)

The Kansas income-tax act provides (G. S. 1935, 79-3203 [b]):

"Corporations shall pay annually a tax with respect to carrying on or doing business of 2 percent on the entire net income, as herein defined, *derived from property located and business transacted within this state* during the taxable year." (Italics ours.)

Montgomery Ward & Co., the plaintiff and appellant here, operates over five hundred retail merchandise stores throughout the United States. During the period here involved it operated between twenty-one and twenty-four such stores in the state of Kansas. Receipts from sales in the Kansas stores constitute the income in issue. All of the merchandise sold in Kansas was bought through the company's offices in Chicago and New York. The company also oper-

ates a warehouse in Kansas City, Mo., which serves Kansas stores. Numerous services connected with the handling of the merchandise and with administrative and supervisory activities are carried on by the general offices outside the state. Further reference to these services will later be made.

The income in controversy was for the company's fiscal years ending January 31, 1936, and January 31, 1937. It is agreed that the total net income received from sales in the Kansas stores was $223,015.25 for the first year named, and $324,862.45 for the second. The accounting methods used in determining such net income are not questioned. The figures were arrived at by deducting from receipts from gross sales in Kansas all expenses and proper deductions directly connected with the Kansas investments and sales operations, and also a pro rata share of the cost of the outside purchasing operations, handling and various managerial and supervisory activities. It is not denied that all goods bought and supplied to the Kansas stores were figured at cost, and all outside services of purchase, handling, management, etc., were figured at cost—in other words, no profit claimed by these outside activities, prior to determination of net income from Kansas stores was allowed. At this point the controversy enters. Having shown such "net income" from Kansas stores, the company made allocation on its returns for each of the years as between Kansas and the other states wherein the outside activities of purchase, handling, management, etc., were carried on. Such allocation was made upon the theory that the "net income" so arrived at was not income wholly "derived" from the retail selling operations in Kansas, but was income "derived" from the combined investments and activities of buying, handling, administration, supervision and selling. In other words, that while the entire income was "collected" or "captured" in Kansas, it was not wholly "derived" from Kansas investments and the selling transactions in Kansas, and that part of it should be allocated to the other states where the buying and other necessary activities took place. The formula used in making the allocation was based upon the expenses incurred in Kansas as compared with the expenses outside the state, which resulted in allocating to Kansas approximately 85 percent of the "net income" of Kansas stores, and 15 percent in the aggregate to the other states. Such percentages resulted in allocating to Kansas for the two years net income of $468,280.97 and to the other states, in the aggregate, $79,596.73. The commission declined to recognize

any allocation and assessed a tax against the whole net income. The additional assessment in controversy amounted to $1,667.51, which included interest to September 15, 1937, and was arrived at by applying a 2 percent tax to the above figure, $79,596.73. Briefly, the position of the commission is that the whole income from Kansas stores was derived from Kansas investments and transactions, that the purchase of goods and the various out-state activities in question involve expenditures, and not income, that before arriving at the "net income" there was deducted the full pro rata Kansas share of the cost of such out-state activities, and that to permit an allocation of the income so arrived at would amount to granting a second deduction based on the same out-state services. The company contends, on the other hand—to repeat—that it took the combined chain of operations from purchase to sale to secure the income, that all goods and services were charged strictly at cost—without profit— to the Kansas stores, and that the allocation of the net receipts has nothing to do with deductions for expenses incurred in realizing those receipts. Again, the commission says in effect that the company makes no profit and gets no income until the goods are sold in Kansas; the company says that no income would be received unless the goods were first bought and that all the out-state services are a necessary part of the operations which ultimately produce the income.

It should be made clear that the allocation formula itself is not here in dispute. The position taken by the company, before the commission, the trial court, and this court, is that the formula which it used is a fair and equitable one, but that if the commission is not satisfied with the formula it will accept any other proper formula that may be prescribed. Our question, therefore, is not whether the formula used, or any other particular formula for making allocation of income would be fair and proper, but whether on the facts in the case there should be no allocation at all—whether Kansas is entitled to impose a tax on the whole income.

It will be helpful at this point to state in a general way what the transactions and services are which are carried on by the company outside the state in connection with operation of the Kansas stores. In addition to the buying of all merchandise the central offices or regional offices outside of Kansas issue complete instructions relative to store operations, prepare individual store operating budgets, prepare all window and counter displays and all advertising copy,

prepare special sales events and issue complete instructions for conducting them, issue detailed information concerning the stocking and display of merchandise, etc., design all store buildings, select store equipment, employ store managers and department heads, conduct all banking and accounting services, supervise and pay all taxes, route all merchandise shipments, handle all claims against common carriers for damage to goods, conduct training schools for sales people and furnish various other services which need not be further enumerated.

The issue may be clarified by a simple illustration. Let us assume that the company sold all its goods in Kansas, but that it bought all of them and furnished all the management and other services above enumerated through offices and warehouses in Missouri, and that all the out-state services were charged at cost to the Kansas stores. Under the theory of the commission the total net receipts from Kansas sales—after deducting all expenses in both Kansas and Missouri—would constitute income derived from Kansas property and transactions. Under the company's theory the income would be derived from the combined Kansas and Missouri properties and transactions and part of it therefore should be allocated to Missouri. Or, to illustrate by an extreme case with reversed situation, let us assume that all the company's offices were located in Kansas and all of its buying and managerial services conducted in Kansas, but none of its sales made in Kansas—all sales being made in Missouri by traveling salesmen who make all collections in that state. It would appear that logical application of the commission's theory in such a case would require a holding that the whole income of the Kansas company would be "derived" in Missouri and none of it from the property or transactions carried on in Kansas. The illustration, let it be noted, involves no question of double taxation, or any contention that double taxation is necessarily unlawful. The point is that if the income is wholly "derived" from the Missouri transactions of sales, it could not at the same time be partly "derived" from the Kansas transactions of purchase and management.

Let us approach the question in another way. As already stated, the instant company charges goods and services at cost to its Kansas stores. Let us suppose that instead of receiving such goods and management services from the company's own out-state offices, the Kansas stores purchased the same goods and the same services from an independent out-state company. Obviously the Kansas stores

could not get the goods and services at cost but would also have to pay a profit—on wholesale basis—to the independent company. On such profit the out-state company would then pay an income tax in the state where its activities for the Kansas stores were carried on, and the "net income" collected from sales in Kansas would be reduced to the extent of the profit so paid. The income would thus in effect be "allocated" as between the Kansas and the foreign company.

Let us follow the preceding illustration with another step. Suppose, instead of there being an independent out-state company, the instant company used a different system of accounting, and charged all goods and services to the Kansas stores, not just at cost, but at a figure which included a reasonable profit—on a wholesale basis— which profit it returned as income in the states where its buying and handling transactions and management services were carried on. Would there be anything improper or unlawful about such a system of accounting? Would it not involve a proper recognition of different sources from which the final income was derived? Is there anything essentially different, and is not the same practical result reached, under the system of accounting which was in fact used in this case? What essential distinction can be urged between an accounting system which marks up profits as they may be said to be earned and one which defers all allocation of profit until the final net income is determined? It is true that if the former system were used and the company paid income on the intermediate book profit in the other states and the ultimate sales showed a net loss the company would be loser under the system, since it could not deduct selling loss from prior profits in making its income-tax returns in the other states. But does such a possibility affect the argument as to the real sources of the income?

Whatever the difficulty of resolving the issue, it is in reality a simple one. It has seemed surprising, therefore, that so few cases have been discovered by the parties or by our own research, which bear directly upon the question. This is to be accounted for, perhaps, by the fact that income tax laws are of comparatively recent origin in this country and time has been insufficient to develop extensive precedents on all branches of the subject.

The two cases cited by appellant which are perhaps most directly in point are *Westby v. Bekkedal*, 172 Wis. 114, 178 N. W. 451, and *International Elevator Co. v. Thoresen*, 58 N. D. 776, 228 N. W. 192.

In the Westby case the essential question was whether the state of Wisconsin could levy an income tax on income collected by residents of New York from the sales of tobacco purchased in Wisconsin, under a partnership agreement with Wisconsin residents. The Bekkedals were a firm located in Wisconsin, engaged in buying, sorting, handling and shipping tobacco. The Rosenwalds were a firm with offices in New York city, engaged in selling, handling and merchandising tobacco. The two firms entered into a partnership agreement under which the Bekkedals were to buy tobacco raised in the state of Wisconsin upon joint account with the Rosenwalds and were to attend to the packing and handling. The Rosenwalds agreed to market the tobacco and apply the net proceeds of the sales to the credit of the joint account. The right of Wisconsin to levy an income tax on the profits of the transactions was attacked on the ground that all receipts were had outside the state and therefore the income in question was not "derived from property and from business transacted within the state of Wisconsin." Under the partnership contract the Bekkedals were to receive forty percent of the net proceeds and the Rosenwalds sixty percent. As in the instant case, the real question was whether the activities of buying and handling by the Wisconsin Bekkedals constituted part of the transactions from which the income was derived, or whether the income was derived by the Rosenwalds from transactions wholly outside Wisconsin. The question was clearly reasoned by the court, which said:

"The sales made by the *Rosenwalds* were one factor, and the purchasing, etc., by the *Bekkedals* were the other factor, the combination of which produced the profit. Hence, to argue that, because the sales were entirely without the state, all of the income was derived from business without the state, when it is conceded that a large part of the business was transacted within the state, is to argue from a false premise. The partnership had an income, at least a part of which was derived from property located or business transacted within the state. . . .

"It is plain that that part of the income belonging to the *Bekkedals* [40 percent] was taxable within this state, it being derived wholly from property located and business transacted within this state. . . .

"As to that portion of the income apportioned under the contract to the *Rosenwalds* [60 percent], it is income derived partly from property and business within the state of Wisconsin and partly from business transacted without the state of Wisconsin, and it should therefore have been allocated. (*U. S. G. Co. v. Oak Creek,* 161 Wis. 211, 153 N. W. 241.) As to the *Rosenwalds,* that portion of the income belonging to them must be treated as *partly earned from business transacted for them by an agent, their partner the Bekkedals, residing within the state of Wisconsin."* (pp. 119, 121.) (Italics inserted.)

It is true, as stated by counsel for the commission, that in the Bekkedal-Rosenwald case the relief sought was denied on the ground of estoppel through failure to appear before the board of review to dispute the assessment as required by the statute. To that extent the statements just quoted may be considered dicta. But they were made directly upon the essential issue involved in the case.

*International Elevator Co. v. Thoresen,* supra, involved a similar issue. Plaintiff company operated a line of grain elevators, about half of which were in Montana and the other half in North Dakota. The plaintiff's income was derived chiefly from the sale, outside the state, of grain bought within North Dakota, and the question was whether North Dakota could assess a tax upon any part of the income from the sales outside the state. Without going into the detailed matters of accounting considered in the case, suffice it to say that allocation of income was sanctioned to North Dakota wholly out of proportion to the receipts within North Dakota. In other words, the essential holding was that the transactions of buying constituted an essential part of the transactions from which the income collected outside the state was derived.

Appellant cites three "Standard Oil" cases, namely, *Standard Oil Co. v. Wisconsin Tax Comm.,* 197 Wis. 630, 223 N. W. 85; *Fisher v. Standard Oil Co.,* 12 F. 2d 744, and *Standard Oil Co. v. Thoresen,* 29 F. 2d 708.

In *Standard Oil Co. v. Wisconsin Tax Comm.,* supra, the plaintiff produced, refined, transported and marketed petroleum products in eleven mid-western states, and its property within Wisconsin consisted chiefly of tanks and filling stations required to serve the Wisconsin demand. Fifty-four percent of the oil stores on its Wisconsin oil farms was sold within Wisconsin and forty-six percent outside the state. Plaintiff did practically no manufacturing within Wisconsin. The controversy arose as to the manner in which that part of its income properly taxable in the state of Wisconsin should be ascertained. The state commission used a ratio method provided in the statute for unitary business transactions conducted within and without the state. That is to say, it applied a percentage to the whole income of the company in determining the income taxable in Wisconsin. The company contended that such a percentage allocation was not necessary, since its Wisconsin income could be directly determined by accounting methods which showed profits received from the Wisconsin transactions. The company contended that the

separate Wisconsin accounts and records showed the Wisconsin business charged *at the market price* of products received by it, and that by deducting from the gross receipts in Wisconsin the expenses of transacting the Wisconsin business, including a proper allocation of general overhead expenses and office accounting, there was properly indicated the income of the company taxable in Wisconsin. The court upheld the company's contention. The appellee here contends that the case is not persuasive, since the Wisconsin income was wholly ascertainable by direct accounting methods. The case does, however, have a distinct bearing on the instant issue, in the fact that the products furnished to the Wisconsin business were charged at *"market value"* rather than at *cost*. *Market value* (at wholesale) included reasonable *profit*, and such profit became income to the company in the outside states. This amounted in effect, to allocation of income, as between Wisconsin and the other states. The court said:

"We perceive no reason why, under the facts in this case, the profits derived from the sales operations should not be ascertained, so far as plaintiff is concerned, as they would be if the sales operations were conducted by a separate corporate entity." (p. 639.)

That comment is in line with observations we have heretofore made in the illustration by a hypothetical case involving an independent outside company.

*Fisher v. Standard Oil Co.*, supra, decided by the circuit court of appeals of the eighth circuit, makes a similar holding. The case involved the method of allocation used by North Dakota in determining income taxable in North Dakota. The company was an Indiana corporation and its business in North Dakota consisted of selling petroleum products at wholesale and retail which it produced wholly outside the state. It is unnecessary here to recite in detail the allocation method used by North Dakota, but the court held that no allocation theory should have been followed, since the net income within the state stood on its own footing, unmixed with outside business, and could be directly determined. The court said:

"On these allegations and admissions in the answer it is freely conceded that the commissioner wholly ignored the value of appellee's property which it uses in the production, manufacture and refining of its products, *because it is contended that profits or income arises only from sales and not from production and manufacture.* . . . We think it cannot be doubted that the products as brought into the state had an easily ascertainable *wholesale market price.* We think appellee's business within the state is easily separable from its other

business by *charging it with the wholesale price* of products which it sells in North Dakota. That would put it on an equality there with those who sell and do not produce and refine." (Italics ours.) (pp. 746, 747.)

There was a similar holding by the United States circuit court in the case of *Standard Oil Co. v. Thoresen,* supra.

Again the pertinency of the case is found in the fact that the court sanctioned the practice of charging the products to the North Dakota end of the business at *wholesale market prices* in determining income derived in North Dakota. The distinction between *market price* and *cost* cannot be ignored. The former includes profits and the latter does not. In the instant case the merchandise and the out-state services were charged to the Kansas stores at cost.

Appellee calls our attention to the case of *S. S. Kresge Co. v. Bennett,* 51 F. 2d 353, in which the court refused to enjoin the tax commission of New York from collecting a tax determined by an allocation formula applied to the company's entire business within and outside New York. The nature of the business was very similar to that of appellant's. The taxpayer, a Michigan corporation, operated a chain of stores throughout the country, a number of which were located in New York. In determining the New York income the commission accepted the taxpayer's reported net income for its entire system and used a ratio based on New York assets as compared to its entire assets. There was no issue such as we have here presented or determined. Injunction was denied on the ground that the taxpayer had not shown by any direct method what its net income in New York was, and that the proceedings before the commission were not sufficient to sustain the action. The court called attention *inter alia* to the fact that in addition to operation of its individual stores in New York the company operated within the state a warehouse for the entire system and that the profit which resulted from these latter activities had not been completely reflected in the net profit of the individual stores.

In *Maxwell Comr. v. Mfg. Co.,* 204 N. C. 365, 168 S. E. 397, which was affirmed by the U. S. Supreme Court in 291 U. S. 642, 54 L. Ed. 437, the court said:

"The bare fact of sale produces no income. It is merely the act by which the income is captured; the capital, the organization or efforts which produce the sale, are the things to be considered in ascertaining the amount of income to be credited to the sale." (p. 370.)

Appellee relies much upon the case of *Shaffer v. Carter,* 252 U. S.

37, 64 L. Ed. 445. The plaintiff, a resident of Illinois, was engaged in the oil business in Oklahoma, having purchased, owned, developed and operated a number of oil leases there. From these properties, all owned and operated in Oklahoma, he received a net income of $1,500,000 which was the subject of the tax. The power of Oklahoma to assess an income tax against him was attacked upon the ground that he was a nonresident, that an income tax is a personal tax and Oklahoma had no jurisdiction to tax him. That was the only issue. The right of a state to tax a nonresident's income received from transactions within the state is well settled. All through the opinion reference is made to *income earned in Oklahoma.* The only possible bearing the case has here lies in the fact that the owner's personal skill and business judgment in directing operation of his Oklahoma properties was partly exercised by him outside the state. The record discloses no expenditures, if any, outside the state in producing the income in Oklahoma. The court said that the fact that the Oklahoma business required the personal skill and management of the nonresident owner and operator to bring his income from producing properties in Oklahoma to fruition, and that he exercised this skill and management from another state "did not deprive Oklahoma of jurisdiction to tax the income which arose within its own borders." Continuing, the court said:

"The personal element cannot, by any fiction, oust the jurisdiction of the state within which the income actually arises, and whose authority over it operates in rem. At most, there might be a question whether the *value* of the service of management rendered from without the state ought not to be allowed as an expense incurred in producing the income; but no such question is raised in the present case, hence we express no opinion upon it." (p. 55.) (Italics ours.)

While the decision did not turn upon the instant issue, it may be noted that the court said that "there might be a question whether the *value* of the service of management rendered from without the state ought not to be allowed as an expense incurred in producing the income." The *value* of such service is something entirely different from the *cost* of such service. *"Value"* would include a reasonable profit. In the instant case it is not disputed that the expense deductions permitted were the pro rata *cost* of the outside service. As heretofore suggested, if all of the outside services had been purchased from another company the Kansas stores would have paid a profit in addition to the cost, and such profit would have been income taxable against the other company in the other state.

The result would be comparable to allocation of net receipts, where outside services had only been charged to the selling agencies at cost.

Both appellant and appellee call our attention to numerous cases involving the validity of allocation by applying a percentage, determined by statute or other formula (G. S. 1935, 79-3218, 79-3219), to the entire income in order to determine the income taxable in a state where the business is only partly carried on. Insofar as these cases merely involve the right of the state to employ such methods to arrive at state income, they are not in point here. It is well settled that states do have such a right. Some of the cited cases, however, do bear upon our issue. A leading case is *Underwood T'writer Co. v. Chamberlain*, 254 U. S. 113, 65 L. Ed. 165. In that case the typewriter company manufactured its typewriters in Connecticut and sold them generally throughout the country. Using a statutory method of allocation, Connecticut determined that forty-seven percent of the company's net income was derived from property and transactions within the state. The company resisted the tax on the ground that only a little over three percent of their net receipts was collected in Connecticut. The court upheld the Connecticut allocation, and it was said in the opinion that—

"The profits of the corporation were largely earned by a series of transactions beginning with manufacture in Connecticut, and ending with sale in other states . . . 'The plaintiff's argument on this branch of the case,' as stated by the supreme court of errors, 'carries the burden of showing that forty-seven percent of its net income is not reasonably attributable, for purposes of taxation, to the manufacture of products from the sale of which eighty percent of its gross earnings was derived after paying manufacturing costs.' The corporation has not even attempted to show this; and for aught that appears the percentage of net profits earned in Connecticut may have been much larger than forty-seven percent. There is, consequently, nothing in this record to show that the method of apportionment adopted by the state was inherently arbitrary." (p. 121.)

Here again is recognition that income from sales is attributable to the series of transactions from which the income is derived.

In *Hans Rees' Sons v. No. Carolina*, 283 U. S. 123, 75 L. Ed. 879, the taxpayer was engaged in the business of tanning, manufacturing and selling leather products. The principal manufacturing and supply house was located in North Carolina. Sales were made throughout this country and many foreign countries. We need not here review fully the facts and the issues. Suffice it to say that the opinion clearly recognized the necessity of using a method of apportioning to a state that portion of entire income "which is reasonably

attributable to the processes conducted within the borders of that state." The court said:

"The difficulty of making an exact apportionment is apparent, and hence, when the state had adopted a method not intrinsically arbitrary, it will be sustained until proof is offered of an unreasonable and arbitrary application in particular cases. But the fact that the corporate enterprise is a unitary one, in the sense that the ultimate gain is derived from the entire business, does not mean that for the purpose of taxation the activities which are conducted in different jurisdictions are to be regarded as 'component parts of a single unit' so that the entire net income may be taxed in one state regardless of the extent to which it may be derived from the conduct of the enterprise in another state." (p. 133.)

Analysis of other cases cited by the parties or encountered in our study would only serve to unduly prolong this opinion. The clear weight of authority supports the proposition that in the case of retail merchandising operations the situs alone of the retail sales does not necessarily determine the source from which the net income is derived. We find no case definitely holding to the contrary. This conclusion is not only sound in logic but is consonant with practical considerations. It is true that in the instant case application of the principle results in the loss to Kansas of about fifteen percent of the income tax which the commission seeks to collect. But the soundness of the proposition may be further tested by the fact that were the situation reversed and the taxpayer's buying and manufacturing activities carried on in Kansas and its retail sales made wholly outside the state, the application of the principle here urged by the commission would result in denial to Kansas of any part in an income tax imposed upon the taxpayer no matter how extensive its investments and its purchasing and management activities might be within the state. Kansas is now embarked upon an effort, under legislative enactment, to promote the industrial development of the state. Such a program will naturally include the location within this state of manufacturing concerns whose products will be sold in large part, or wholly, outside the state. The question of policy involved in this laudable effort is not our concern—we are here only considering the question of law. It may be said, however, that the application of the theory that net income is only derived where sales are made would logically require renouncement of any right of Kansas to impose a tax on income not actually collected within the state.

We have not overlooked appellee's contention that the theory

urged by appellant would in many cases be incapable of practical application. Appellee says in its brief:

"From a purely economic viewpoint, appellee agrees with such a theory; however, it must be remembered that taxation is an intensely practical matter, and therefore cannot deal with abstract, idealistic theories."

It may well be that situations will arise where an effort to determine different sources of income would break down on account of its complexity. But no such difficulty is here presented. It is true that scientific accuracy in these matters cannot always be achieved and courts have repeatedly held that such result is not necessary in order to sustain the validity of the method used. But we see no reason in the instant case to hold that the net income arrived at in the manner heretofore stated cannot be fairly allocated in order to determine what portion is derived from property located and business transacted within this state.

We conclude that the net income here involved was income derived as a consummation of the whole chain of activities which ultimately produced it; that it was not therefore wholly derived from property and business transacted in Kansas. The appellant submitted for consideration of the commission an accounting formula for making the allocation. We do not say that the formula employed is the proper one. It is the duty of the commission to see that a just and equitable basis of allocation is used. That is an administrative duty and not a judicial one. If the commission should determine after full consideration that the Kansas income of appellant cannot fairly be determined under the direct accounting method of section 79-3217, G. S. 1935, or by using the proposed formula, it may prescribe a different method for doing so, within the limits of its statutory authority. We only here determine that under all the facts of the case the commission has improperly held that appellant's net receipts from retail sales in Kansas are wholly derived from property located and business transacted within the state. Both under state law and the requirements of the federal constitution it is necessary that there be equitable segregation of that portion of the income derived from property and transactions within the state.

We consider now appellees' contention that appellant failed to comply with the requirements of the income-tax law and with the commission's regulations, and therefore has failed to exhaust its administrative remedies. The alleged noncompliance consisted of failure to secure permission to use a new "method of allocation" of

income to Kansas, and failure to show that a method of allocation provided in the statute was "impracticable" and "inequitable" as applied to its business.

The pertinent provisions are found in sections 79-3217, 79-3218 and 79-3219, G. S. 1935 (hereinafter referred to as sections 17, 18 and 19), and articles 79 and 12 of the regulations. We need only summarize them.

The three sections relate to taxpayers whose business is carried on partly within and partly outside the state. Section 17 deals with such cases where the taxpayer's account books are so kept as to reveal directly the income taxable by Kansas. In such case the commission need only to satisfy itself that a proper and fair method of direct accounting to segregate Kansas income has been used, and does not need to consider the taxpayer's entire income within and outside the state. Section 18 covers cases, with certain exceptions, where there has been no separate accounting to reveal Kansas income and it is necessary to apply some percentage to the whole income. The section provides a formula for determining the ratio or percentage to be applied to the whole income. Section 19 is intended to cover cases where, on account of the particular nature of the business, the formula of section 18 would be impracticable or inequitable and would work an undue hardship upon the taxpayer. In such cases the taxpayer may employ a different allocation formula, subject to commission approval, or the commission itself may prescribe a formula.

Article 79 of the regulations provides that such taxpayers must make application and secure permission of the commission to use or change an allocation method—whether the method be by direct accounting (sec. 17) or by percentage formula applied to the whole income (secs. 18 and 19). Other provisions of article 79 need not be noted.

Article 12 of the regulations relates specifically to methods of accounting, provides that returns be made on the basis used in filing return for the preceding year, unless otherwise authorized, and further provides that "where a change of accounting period or methods is desired the taxpayer should file his return on the new basis, accompanied by a statement specifying the classes of items differently treated under the two methods and specifying all the amounts which are duplicated or entirely omitted as a result of the change."

Appellant's books are set up on the direct accounting basis (sec. 17) for the purpose of segregating Kansas income. Separate accounts are kept for each Kansas store. For the years in question the returns showed net receipts of Kansas stores and apportionment of such net receipts—to indicate Kansas income—and were accompanied by a statement showing the method followed in making such apportionment, as heretofore stated in this opinion. It will be noted that there is not involved any computation based upon the total income within and outside the state. The company contends that this apportionment was an addition to its direct accounting system and has nothing to do with allocations made by formula under section 18 or 19, and that the statement was submitted for commission approval in compliance with regulation 12. The commission contends that this was a new method of allocation and that sections 18 and 19 are applicable and required formal application upon commission form provided for the purpose. And the commission says that since sections 18 and 19 apply it was incumbent upon the taxpayer to demonstrate that the formula provided in section 18 was "impracticable" and "inequitable" and would work an undue hardship upon it and that it failed to offer any such proof. Whether formal application should have been made or not, it seems clear that the apportionment of net Kansas receipts does not fall within the formula methods of sections 18 and 19, since it does not involve the company's total receipts within and outside the state. Whether it was in fact a change in "accounting" or a change in "allocation" is a technical question which, in view of the whole record, we do not consider necessary to determine. We briefly review the salient facts of the record.

The returns were regularly made as indicated, disclosing fully the methods of accounting and apportionment of net receipts. In due course they were audited and the taxpayer was notified that apportionment or allocation of any part of the net receipts to sources outside Kansas had been disallowed and that a tax had been imposed upon the total net receipts. Thereupon that company notified the commission that it desired a hearing upon the issue, as provided for in the statute, and such a hearing was duly held. All parties were represented, arguments were made, and the whole issue fully considered. After adverse ruling the company made timely appeal to the district court, and from the judgment there entered appeals to this court. The record, which includes the correspondence between

the commission and the company, discloses that at no time during the pendency of the matter before the commission, either before or during the hearing, did the commission notify the company or contend that there had been any failure to follow procedural requirements of the statute or of the regulations. Nor was such issue raised in any pleading filed by the commission in the district court. It appeared first in the argument in the district court. The only issue here is the one which was squarely raised by the commission and determined by it. There can be no contention that the administrative body was not given full notice and full opportunity to pass upon the taxpayer's contention. Appellee does not here contend that any new contention was made by appellant in the trial court or that we are asked to pass upon any substantive question except the one involved in the commission hearing. We do not say that under other facts and circumstances the contentions of the appellees as to procedural defects might not be well founded. We only say that upon the facts of this case the appellant is clearly entitled to judicial review of the commission's holding and of the judgment of the trial court.

The judgment is reversed and the state tax commission directed to determine, in harmony with the conclusions heretofore stated, what portion of the net receipts in issue is properly taxable as income derived from property located, and business transacted, in Kansas, and to make such lawful and appropriate orders in connection therewith as may be necessary in the premises.

HARVEY and ALLEN, JJ., dissenting.