No. 44,062

WEBB RESOURCES, INC., formerly known as ANSCHUTZ DRILLING COMPANY, INC., *Appellee*, v. WAYNE E. McCOY, Kansas State Director of Revenue, *Appellant*. (In the Matter of Webb Resources, Inc., formerly known as Anschutz Drilling Company, Inc., and the Deficiency Income Tax Assessment levied on such company for the fiscal year 1958.)

(401 P. 2d 879)

Opinion filed May 15, 1965.

*Dean Burkhead*, of Topeka, argued the cause, and *C. A. Arterburn*, also of Topeka, was with him on the brief for the appellant.

*Mark H. Adams, II*, of Wichita, argued the cause, and *Mark H. Adams, Charles E. Jones, Wm. I. Robinson, J. Ashford Manka, Clifford L. Malone, John S. Seeber* and *Philip L. Bowman*, all of Wichita, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal by the director of revenue from an adverse ruling in the lower court under the Kansas income tax law as applied to a multi-state corporation whose gross income is derived from property located and business transacted in part within and in part without the state of Kansas.

The principal question involves the proper method of determining the corporation's income allocable to Kansas for income tax purposes.

In accordance with the facts hereafter stated, the director of internal revenue of the state of Kansas assessed additional income tax to the appellant for the fiscal year 1958. This assessment was approved by the board of tax appeals, and the taxpayer appealed to the district court. In the district court the parties agreed upon and read a stipulation of facts into the record. The stipulation, with some omissions, reads:

"This proceeding arises on appeal of Webb Resources, Incorporated, formerly known as Anschutz Drilling Company, Inc., a Colorado corporation, from Order number six of the Board of Tax Appeals of the State of Kansas dated June 20, 1962, as supplemented by supplemental order 6-A, dated August 16, 1962, assessing additional income tax against the appellant Webb Resources Incorporated in the amount of $4,858.33 or $3,877.64, whichever the case may be for appellant's tax year 1958, which is a fiscal year ending June 30, 1958. Appellant has no principal place of business within the state of Kansas . . . .

. . . . . . . . . . . . . . .

"Appellant in preparing and filing its 1958 Kansas State Income Tax return allocated its income and losses to the State of Kansas under the formula allocation provided for in G. S. 1949, 79-3218, as amended. The assessment of additional corporate income tax which is here appealed from arises by virtue of the Director's insistence that the appellant should have allocated its income to Kansas under the direct accounting method provided for by G. S. 1949, 79-3217. Appellant contends here, and contended below that it was and is a unitary company and is thus required to apportion its income as provided by our 79-3218. Although the Director contends that the appellant here may not change from the direct method to the formula method of allocation which was the basis for its 1958 return, it is conceded by the Director that in the event it is determined and adjudged by the Court that appellant's 1958 return was properly filed under G. S. 1949, 79-3218, as amended, the orders of the Board of Tax Appeals should be reversed and the additional corporate income tax here appealed from should be abated in full.

"At all times material hereto appellant was duly authorized to carry on its business within the State of Kansas and within the states of Montana, North Dakota, Utah, Wyoming and Nebraska. The nature of the business carried on by appellant, both within and without Kansas, is exploring for, drilling for, finding, producing and selling oil and gas and other liquid hydrocarbons. The appellant's home office is located in Denver, Colorado, from which its business and operations are managed. There are located its geologists, landmen, production supervisors, company officers and clerical staff. There are made decisions as to all company operations, including whether to undertake the exploration for and the drilling of oil and/or gas wells, whether within the State

of Kansas or without. There are retained and used its bank or file of leases of developed and undeveloped acreage located throughout all of the several states in which appellant does business.

. . . . . . . . . . .

"The products which appellant produces and sells, oil, gas and other liquid hydrocarbons, are wasting natural resources. It is necessary for appellant to follow a constant program of exploration, drilling for, finding and producing such products. Oil or gas are where you find them. The company undertakes to pursue its operations, not only in Kansas but throughout the several states in which it does business.

"The nationwide ratio of wells drilled to wells which encounter sufficient reserves of oil or gas to pay back the initial expense of drilling and completing is approximately forty to one. Appellant's average has been better. On the average it has found one producer for every ten holes drilled; in other words on the average of nine out of ten holes drilled are and have been dry holes. In other words an average of nine dry holes must be drilled before one producer will be found, whether such dry holes are drilled in Kansas or not.

"All of the oil and gas which appellant produced and produces was and is sold to other companies. No oil which it produced within the State of Kansas was moved by it across Kansas borders.

"In its fiscal year 1958, ending June 30, 1958, appellant filed its Federal income tax return reflecting no taxable income for such year. In every other state, with the exception of Kansas, where appellant realized income from oil operations in the fiscal year 1958, appellant was recognized and accepted as a unitary company, and required to apportion its income and losses to such state for tax purposes under a formula apportionment similar to G. S. 1961 Supplement 79-3218. Appellant's return to the State of Kansas for fiscal year 1958 apportioned its income and costs to the state under the provisions of G. S. 1949, 79-3218, as amended. It was this return which the State Department of Revenue contends did not correctly allocate income to the State of Kansas for the asserted reason that such income should have been directly allocated under G. S. 1949, 79-3217.

"Appellant can determine its gross income by state lines in that it knows the exact number of barrels of oil produced from each well. It knows the location of each well. Appellant can determine the exact cost of drilling and the exact cost of equipping each well as well as direct costs of operation by state lines.

"Appellant was incorporated in December of 1955 in Colorado. At that time it was primarily a producer with drilling rigs and exploration, and substantially all of its income was derived from contract drilling. For the years 1955, 1956 and 1957 appellant's returns to the State of Kansas allocated income and costs to the state under the direct accounting statute, G. S. 1949, 79-3217. In the first month starting the new fiscal year of 1958, the appellant disposed of all its rigs, . . . In the fiscal year 1958 appellant's primary source of income was derived from disposing of the drilling rigs, plus the sale of an oil payment, and some additional income from the production and sale of oil and gas.

"Under the date of December 11, 1957, which, of course, was within the 1958 fiscal year, with the effective date being December 1, 1957, at 7:00 A. M. the appellant, in order to raise the sum of $600,000.00, assigned its oil payment loan of eighty percent of proceeds at the well of all oil and gas, as, if and when produced, saved and marketed from its interests in all of the oil and gas leases which it at that time held both within and without the State of Kansas. The payment burdened all of the producing properties in the states of Colorado, Kansas, Wyoming, Nebraska and North Dakota. In 1958 the company had oil and gas production in all of the states in which it did business except New Mexico, Utah and Montana. In the state of New Mexico in the fiscal year 1958 it continued a contract drilling operation through a wholly owned subsidiary. That was a workover-type rig, which contracted for various companies needing to complete wells.

"During the fiscal year 1958 appellant had twenty-six wells in all other states than in Kansas. It had 110 wells within Kansas. Of the approximately 110 wells the appellant operated within the State of Kansas 84 wells were strippers, a marginal type of production. Because of the cash poor position of appellant it proved necessary to continue to operate those wells as long as they yielded a profit over and above their operating expense, even though the wells did not produce enough to make their depreciation. It was testified to that in the year 1958 the appellant realized an average gross profit out of a barrel of oil produced within the State of Kansas of only sixty-eight cents. For appellant's operations within the State of Colorado the average figure per barrel is ninety-one cents. For appellant's operations within the State of Nebraska, the figure is $1.14 per barrel, and in Wyoming $1.08 per barrel. This cost is on a unit basis and, of course, it takes just as long to record entries and billings off of a stripper as it does off of a 300 or 400 barrel well, and other operating expenses are similar. It was necessary to continue operating the Kansas wells, because of the fact that appellant needed profit wherever it could get it, and the profit from the Kansas operations was essential to appellant's multi-state business.

"Prior to 1958 appellant's Denver office employed approximately twenty or twenty-two people, including ten in the Accounting Department. Because of the necessity of cutting back, appellant in 1958 had only eleven employees, including the President, two of whom were in the Accounting Department. These also included two geologists, one production man, two engineers and three secretaries. In the fiscal year 1958 appellant employed a production man in Great Bend, Kansas, and also one at Casper, Wyoming, which last office terminated upon the sale of the rigs. If there were production problems, like work-overs, no matter where they were, or completions, etc., the production man from Kansas might be sent to supervise it or it might be supervised by a man sent out from the Denver office.

"The job of the Production Superintendent at Denver was primarily connected with the production of appellant's wells. The actual completion was done by independent contractors, with appellant's Production Superintendent acting in an advisory capacity, no matter where the well was drilled. The production man in Great Bend reported directly to the Denver office and his only responsibilities were to carry out direct orders and requirements issued

from the Denver office with respect to seeing to it that the production from appellant's wells within the State of Kansas was kept at the maximum efficient rate permitted by the Kansas State Corporation Commission.

"The principal duties of the Denver office are supervision of production and exploration for new reserves. This includes the assembling of acreage or acquisition of leases for drilling. While production goes on continually, exploration is somewhat more intermittent. Although appellant employed during the fiscal year 1958 two engineers full time, it also consulted an engineering firm regularly. It is very necessary to know the engineering figures, reserves, etc. In the fiscal year 1958 appellant spent $517,360.13 on exploration for new reserves of oil and gas in the states in which it did business. In that same year $18,499.27 was expended by appellant for exploration within the State of Kansas. All of the findings from the exploration work were developed and evaluated in the appellant's Denver office.

"Appellant's Denver office provided all legal services throughout the whole operation of appellant in all states, with the exception that local counsel were as a practice employed by the Denver office on certain local matters. All accounting work for appellant was performed in the Denver office, although consulting accounting firms were employed for auditing purposes.

"Key personnel were hired or fired only by the executives in the Denver office. As new problems arose, the best qualified man to do the job, regardless of where he had worked before was assigned thereto. All employees were paid out of the Denver offices, and all primary payroll records were maintained there, and all insurance and employee benefits were controlled and supervised there.

"The district production man had jurisdiction to supervise the wells in the surrounding geographical area, limited not by state boundaries but by what he could practically supervise. He had limited jurisdiction to purchase lesser amounts of supplies in bulk. All other services, equipment and supplies were contracted for through the Denver office. Such central buying resulted in price advantages or other favorable treatment.

"Appellant's activities were financed by income from all sources, including the state of Kansas. In the fiscal year 1958 there was no separation as between states of earnings and surplus. On the company's books maintained in Denver there was maintained only one account for all its multi-state business, such as revenue, accounts payable, receivable, etc., none of which was broken down or totaled on a state by state basis. However, gross revenues, direct drilling costs, and direct lease operating costs could be determined by state line from supplemental records kept by appellant. The total amounts of gross revenues, direct costs, both within the State of Kansas and without, are necessary in order to calculate the net taxable income allocated under either method; 79-3217, direct accounting, or 79-3218, formula allocation.

"The company's executive officers exercised tight fiscal control throughout all areas of operation. Sales of all products were negotiated or approved before sale by the executive officers in Denver."

The foregoing facts, as stipulated by the parties, were accepted by the trial court as true and correct and adopted as its findings of fact. It thereupon made the following conclusions of law:

"Conclusions of Law

"I.

"Appellant is a multi-state unitary company operating as one integral business rather than several business entities.

"II.

"Appellant's books of account and records do not clearly reflect the net income subject to tax within the State of Kansas. The direct allocation method of reporting income tax for Kansas income tax purposes is impracticable.

"III.

"Appellant was required to use the 'factor formula' method of allocating its income for Kansas for income tax purposes under G. S. 1949, 79-3218 as amended.

"IV.

"Appellee's order levying additional income tax against appellant does not comply with the above statute.

"V.

"Appellant was not required by statute to first obtain approval from the Director of Revenue prior to changing its method of allocation.

"VI.

"*Inter*state as well as *intra*state commerce is here involved. A state tax which subjects *inter*state commerce to the risk of a double tax burden to which *intra*state commerce is not exposed is a forbidden 'multiple' taxation upon *inter*state commerce and constitutes a violation of the commerce clause of the United States Constitution.

"VII.

"The additional assessment required under the orders of the Board of Tax Appeals is arbitrary, capricious, illegal and invalid constituting a violation of the Fourteenth Amendment to the United States Constitution.

"VIII.

"Judgment is hereby entered in favor of plaintiff reversing order number 6 of the Board of Tax Appeals as supplemented by order 6-A of that board in whole and the tax abated."

Under Kansas law an income tax is levied upon corporations whose income is derived from property located and business transacted within the state of Kansas during the tax year. The statute applicable to the facts in the instant case is G. S. 1957 Supp., 79-3203, which reads in part as follows:

". . . (*b*) *Corporations.* Corporations shall pay annually a tax with respect to carrying on or doing business of three percent (3%) on the entire net income, as herein defined, derived from property located and business transacted within this state during the taxable year. . . ."

Where a corporation does business in more than one state, the problem is to determine what portion of the corporation's income is derived from property located and business transacted within the state of Kansas during the tax year in question. Constitutionally,

the state may only tax the income from the taxpayer's business within a state. It cannot attempt to tax income earned in another state, nor by the same token is it required to allow a taxpayer to attribute income earned in this state to its out-of-state activities, nor is it required to allow as a deduction losses or other deductions incurred in other states.

The legislature has given attention to the method of determining what income and expenses are attributable to the taxpayer's operations in Kansas by enacting two statutes. The first, hereafter referred to as the *direct* method of income allocation, is contained in G. S. 1949, 79-3217 (repealed L. 1963, ch. 485, § 24). It reads:

"In the case of nonresident individuals whose gross income is from sources in part within and in part without the state, and corporations the gross income of which is derived from property located and business transacted in part within and in part without this state, direct allocation of such income may be made where practicable on the books of account and records of the taxpayer, together with the deductions applicable thereto, where such methods clearly reflect the net income, and returns made on such basis shall be accepted in computing the tax."

The second, hereafter referred to as the *apportionment* or *formula* method of income allocation, is set forth in G. S. 1957 Supp., 79-3218 (repealed L. 1963, ch. 485, § 24). Insofar as the statute is material to the present discussion it provides where the nature of the business is such as to render direct allocation impracticable, or where the books of account and records do not clearly reflect the net income subject to tax, the net income allocated to Kansas shall be computed by taking the arithmetical average of the following factors: (1) The ratio of costs of Kansas property to costs of property everywhere used in connection with the business carried on; (2) the ratio of costs of Kansas manufacturing or selling to the costs of manufacturing or selling everywhere during the taxable year; and (3) the ratio of Kansas gross sales or revenue to gross sales or revenue everywhere in connection with the business carried on during the taxable year. By applying the arithmetical average ratio or percentile thus obtained to the net income of the entire business, the income attributable to Kansas is determined.

The two statutes in question leave much to be desired, and this perhaps accounts for their repeal by the legislature in 1963. These statutes were before the court in *Crawford Manufacturing Co. v. State Comm. of Revenue and Taxation*, 180 Kan. 352, 304 P. 2d 504. There the manufacturing company allocated its net income

to Kansas by the direct method, and the director of revenue assessed an additional tax against the company on the theory that it was required to report its income under the formula method of allocation. It was ultimately determined on appeal to this court that the taxpayer did not sustain the burden of showing that the formula method, ordered by the director to be applied, did not clearly reflect a *just and equitable* allocation of net income to Kansas.

Basic considerations in appealed cases of this type were stated in the *Crawford* decision. In the opinion the court said:

"The duty to administer and enforce the Kansas Income Tax Law is cast upon the Director of Revenue under the supervision and direction of the commission, and the legislature has given him full jurisdiction to accomplish this purpose. (G. S. 1949, 74-2415, 74-2422, 79-3209, 79-3219.) This is an administrative duty and not a judicial one. (*Montgomery Ward & Co. v. State Tax Comm.*, supra [151 Kan. 159, 98 P. 2d 143].) In carrying out this duty he must guard against being arbitrary or capricious, and where the provisions of the statute are clear, he must follow them. It is his duty to see that the proper method of allocation is justly and equitably applied but arithmetical accuracy is not generally possible in this difficult field. All methods of allocation, direct or separate accounting as well as the factor formula, contain estimates and, in varying degrees, are applied by the exercise of human judgment. *If the method adopted accords with our statutes and regulations and produces an allocation approximately correct, although not meticulously precise, and is arrived at by the exercise of fair human judgment so that it reasonably attributes income allocable to property owned and business transacted within this state, it meets the test of being just and equitable. So long, therefore, as he acts within the scope and intent of the statutes and regulations, free from arbitrary, unreasonable or capricious action, his determination, subject to the supervision and direction of the commission, of questions arising out of the administration of this law, is final and conclusive and on appeal the only question for review is whether he so acted.*" (p. 362). (Emphasis added.)

In *Crawford* it was also held in computing the net income of a multi-state corporation whose gross income is derived from property located and business transacted in part within and in part without the state of Kansas, the direct method of allocating income prescribed by 79-3217, *supra*, could not be employed if the business is of a unitary character. Where the business is unitary in character net income should be determined by the application of the formula method set forth in 79-3218, *supra*, thus giving weight to the different factors responsible for earning the income so as to apportion it from the entire business among the states in which it was earned.

It was said a multi-state business is a unitary business for income tax purposes when the operations conducted in one state benefit and are benefited by the operations conducted in another state or states. If its various parts are interdependent and of mutual benefit so as to form one integral business rather than several business entities, it is unitary.

It was further said whether a multi-state business is separate or unitary depends upon the manner in which its business is conducted. The essential test to be applied is whether or not the operation of the portion of the business within the state is dependent upon or contributory to the operation of the business outside the state. If there is such relationship, the business is unitary.

The trial court held, in effect, the action of the director in the instant case, in allocating the income of the taxpayer (appellee) under the direct method (79-3217, *supra*), was arbitrary, capricious and unlawful.

We must look to the stipulated facts to determine as a matter of law whether the trial court's conclusion on this point is correct.

Authorities in other states which have addressed themselves to allocation of income from oil and gas production for income tax purposes are not uniform in their holding as to which method is to be employed in allocating income of a multi-state corporation to the state.

On facts substantially similar to those presented in the instant case the state of California has held the business of a corporation, engaged in the exploration for, and extraction and sale of oil and gas in fifteen states and the Dominion of Canada, was unitary in nature and thereby entitled to compute state franchise taxes by the formula method in allocating a portion of the overall income of the business to the taxing state. (*Honolulu Oil Corp. v. Franchise Tax Bd.*, 60 Cal. 2d 417, 34 Cal. Rptr. 552, 386 P. 2d 40; and *Superior Oil Co. v. Franchise Tax Bd.*, 60 Cal. 2d 406, 34 Cal. Rptr. 545, 386 P. 2d 33.) These decisions may be attributable to the narrow issue presented. In *Superior* it was said:

"The narrow issue herein, in terms of the statute, is whether Superior's income is 'derived from or attributable to sources both within and without the State.' (Rev. & Tax. Code, § 24301.) If such income can be so categorized then an allocation of total net income would naturally follow from the mandatory language of section 24301, and a separate accounting, as sought by the board, could not be approved." (pp. 410, 411.)

The *Honolulu* case, immediately following *Superior* in the California official reports, followed the holding in the *Superior* case. Within the foregoing issue the question was whether the taxpayer's operations in several jurisdictions, including California, were unitary in nature and thus subject to local taxation on a basis which allocated a portion of the overall net income to California (citing the statute) or whether, on the other hand, the local operations were sufficiently separate to justify local taxation on the net income derived from such separate, local operations.

The taxpayer (appellee) relies on these decisions as "bay horse" cases and controlling, while the director contends they are based strictly upon the California statute and, therefore, distinguishable.

The Supreme Court of Louisiana in *Texas Company v. Cooper*, 236 La. 380, 107 So. 2d 676, held an oil company conducting operations on a world-wide scale was not of such a unitary nature that it was impossible and inequitable to attribute any direct profit to its Louisiana production operations, which consisted solely of the gathering of crude oil for shipment outside the state. Hence the separate accounting method for state income tax purposes was held feasible.

Similarly, the Supreme Court of Oklahoma in *Magnolia Petroleum Co. v. Oklahoma Tax Com.*, 190 Okla. 172, 121 P. 2d 1008, held an income tax assessable to a foreign corporation producing crude oil in the state, and shipping the same to itself and others in other states, based upon direct allocation of gross profit determined by costs of production and market price at time of shipment was held to be a practicable method for the assessment of net income derived from oil. There the Oklahoma tax commission sought to assess the tax under the formula method. In the opinion the court said:

"The commission takes the position that the income reflected by the books of the crude purchase and storage department was 'derived from property located and business transacted in part within and in part without this state,' as defined in the statute, and that the gross profit thereon for income tax purposes was not subject to direct allocation by any practicable method, but the resort to indirect methods was the only practicable solution whereby Oklahoma could properly tax its portion of the net income derived from all oil received by the department in question.

"On the other hand, the taxpayer insists that its gross profit from the oil produced here, and the expense connected with its production and sale, were easily ascertainable by a practicable direct method of allocation, and that the net income therefrom had been so ascertained, and had been reported to the commission and paid.

"In our opinion, the intention as expressed in the statute is that direct allocation be made in all cases of this character where practicable, and that indirect allocation be made only in those instances where the same would prove more practicable than direct allocation. *The statute clearly favors direct allocation. The purpose in such case can be only to tax profits actually made in this state. To extend the operation of the statute beyond that point and tax profits arising beyond the jurisdiction of the state would violate the due process clause of the Federal Constitution. Therefore, direct allocation is entitled to first consideration. Where direct allocation can be employed, all suspicion of unconstitutional taxation is dispelled.*

"The above is in accord with the decisions of other courts. In cases where the books of account and records of the taxpayer substantially reflect the net income derived from the business transacted and property located within the state, the income tax assessment must be limited thereto. Standard Oil Company of Indiana v. Wisconsin Tax Commission, 197 Wis. 630, 223 N. W. 85; Fisher v. Standard Oil Co., 12 Fed. 2d 744. If the business of the taxpayer transacted within the state is separable from its other business, no allocation is necessary. The rule is stated in the last-cited case as follows:

" 'Theories of allocation have no place in determining income tax on corporation, if net income within state can be distinguished from outside business.' " (p. 175.) (Emphasis added.)

The Oklahoma statutes are substantially the same as the Kansas statutes here in question.

Other cases holding the direct method of allocating income proper are *Standard Oil Co. v. Wisconsin Tax Comm.*, 197 Wis. 630, 223 N. W. 85; *Standard Oil Co. v. Thoresen*, 29 F. 2d 708 (8th Cir.); and *Fisher v. Standard Oil Co.*, 12 F. 2d 744 (8th Cir.). (See, also, *Skelly Oil Company v. Commissioner of Taxation*, 131 N. W. 2d 632 [Minn. 1964]; and *Rock Island Ref. Co. v. Oklahoma Tax Com.*, 194 Okla. 349, 147 P. 2d 1000.)

The taxpayer's Kansas income tax return for the fiscal year 1958 was admitted in evidence by stipulation of the parties. On the basis of this return, computed under the formula method, 34% of the taxpayer's property is located in Kansas; 25% of its manufacturing costs are incurred in Kansas; and its sales in Kansas constitute 43% of its total. Also, during the tax year involved the taxpayer sold an oil payment which burdened 80% of all its properties. Under the existing law the sale of such oil payment constitutes income in the year of sale. The taxpayer's return shows that 71% of the oil payment would be obtained from Kansas properties. The taxpayer's return under the formula method discloses 34% of the taxpayer's income and deductions is attributable to this state, in spite of the fact that 43% of its gross income is earned in Kansas, while only 29% of its direct costs is incurred in this state.

It must be conceded that Kansas, having the right to collect a tax imposed on net income, has the right to determine what that income is in relation to the business transacted within the state, if it meets the test of being just and equitable. This is true even though the net income by the direct accounting method is more than what would be the state's aliquot portion of the earnings based on the formula method of income allocation.

The United States Supreme Court has held the entire net income of a corporation, generated by interstate as well as intrastate activities, may be fairly apportioned among the states for tax purposes by formulas utilizing instate aspects of interstate affairs; and that the commerce clause and the due process clause are not violated by state statutes levying nondiscriminatory net income taxes on that portion of a foreign corporation's net income earned from and fairly apportioned to business activities within the taxing state, even though these activities are exclusively in furtherance of interstate commerce. (*Northwestern Cement Co. v. Minn.*, 358 U. S. 450, 3 L. Ed. 2d 421, 79 S. Ct. 357, 67 A. L. R. 2d 1292 [1959].) Where the direct method of income allocation can be employed, all suspicion of unconstitutional taxation is dispelled. (*Magnolia Petroleum Co. v. Oklahoma Tax Com.*, supra.)

When the provisions of 79-3203(*b*), *supra*, are construed with 79-3217 and 3218, *supra*, it is apparent the direct method of allocation or accounting is the favored one. It is first mentioned in the statutory scheme and corresponds most nearly to 79-3203(*b*), *supra*, which imposes the tax. The formula method of allocation may only be used where "the nature of the business is such as to render direct allocation impracticable or where the books of account and records do not clearly reflect the net income subject to tax by this act." Where direct accounting is employed it assigns to this state the actual income from property owned and business transacted within this state as required by 79-3203(*b*), *supra*.

On the facts the instant case is stronger than the *Magnolia* case because it was stipulated that all of the oil produced in Kansas by the taxpayer was and is sold to other companies; and that no oil which it produced within the state of Kansas was moved by it across Kansas borders.

Whether the taxpayer's multi-state business is a unitary business for income tax purposes under the test laid down in *Crawford* requires attention.

On the facts in *Crawford* the director levied an additional income tax against the manufacturing company by applying the formula method for allocating income to Kansas. The taxpayer used the direct method. In the instant case the situation is reversed. In *Crawford* the director's action was held to reasonably attribute income allocable to property owned and business transacted within this state, and met the test of being just and equitable. He was said to be free from arbitrary, unreasonable or capricious action in applying the formula method. Under these circumstances, it was simple to expound on the unitary character of a taxpayer's business. But application of the definition in accordance with the test to determine whether the business of a multi-state corporation is unitary, as there stated, must be tempered by the foregoing basic construction of the statutes involved (79-3203[b]; 79-3217 and 79-3218, *supra*), and the facts which gave rise to its pronouncement. This, of necessity, restricts its application to businesses which are clearly unitary.

In *Texas Company v. Cooper*, supra, it was said:

" '. . . An example of a unitary business where it would seem to be impossible to make a separate accounting of income within the boundaries of a state would be an express company, a telephone or telegraph company, in which the whole operation "constitutes but a single plan, made so by the very character and necessities of the business." . . .' " (p. 396.)

A text discussing the subject is Altman and Keesling, *Allocation of Income in State Taxation* (1946) at pages 74 and 102.

In our opinion on the facts here presented, the portion of the taxpayer's business conducted within the state of Kansas is not dependent upon or contributory to the operation of the taxpayer's business outside the state. Whether the taxpayer could conduct its wildcatting operations in other states without the profits derived from the production of oil and gas in Kansas is not the question or the test.

In our opinion the director of revenue acted well within the scope and intent of the statutes here involved in allocating income of the taxpayer pursuant to the direct method of accounting. Within the meaning of 79-3217, *supra*, direct allocation of income was practicable on the books of account and records of the taxpayer, together with the deductions applicable thereto, and such method clearly reflects the net income of the taxpayer attributable to Kansas. It cannot be said the business of the taxpayer of exploring for, drill-

ing for, finding, producing and selling oil and gas and other liquid hydrocarbons is of such a unitary character in its multi-state operations as to require application of the formula method of income allocation to Kansas under 79-3218, *supra.*

It was specifically stipulated that the direct method of allocation for reporting income tax to the state of Kansas was used in the returns filed by the taxpayer within the state for the years 1955, 1956 and 1957. Further, the gross revenues, drilling costs and operating costs could be determined by state lines from supplemental records of the taxpayer. It was stipulated the taxpayer can determine its gross income by state lines in that it knows the exact number of barrels of oil produced from each well; it knows the location of each well; the taxpayer can also determine the exact cost of drilling and the exact cost of equipping each well, as well as the direct costs of operation within the geographical area of Kansas.

The only part of the taxpayer's Kansas business which is conducted beyond the borders of this state is the management functions of the home office in Denver, wherein are located its geologists, land men, production supervisors, company officers and clerical staff. Hence, the decision making and bookkeeping transactions are maintained without the state. These expenses are ordinarily considered to be general or overhead type of expenses which are required in any type of business which crosses state lines.

Kansas Income Tax Regulation 92-4-85 (revoked January 1, 1964) provides that in the use of separate accounting methods, separate records must be kept of sales, cost of sales and expenses for Kansas business as distinct from the remainder of the business. Overhead items of income and expense, which cannot be directly allocated on the books and records as provided in 79-3217, *supra,* must then be allocated to the business within and without Kansas. It further provides the method of allocating these overhead items of income by types of businesses.

The taxpayer argues its total income for fiscal year 1958 under the federal return was $114,642.99. Using the formula method of income allocation the total income assessable by the various states in which its operations are conducted for income tax purposes would represent 100% of such total income. On this basis there would be allocated to the state of Colorado 11.43%; to Montana 13.52%; to North Dakota 8.07%; to Utah 5.55%; to Wyoming and Nebraska (no income tax) 26.88%; and to Kansas 34.55%.

Under the direct method of allocating income to Kansas, the taxpayer argues the total income, as adjusted, attributable to Kansas is $157,172.29, which amounts to 137.10% of its total income as computed under the federal return. By using the formula method in other states, income taxable by such other states would be $75,034.98 which amounts to 65.45% of its total income. It is therefore argued the total income being taxed under the direct method as proposed by the director of revenue in the instant case is $232,207.27, which amounts to 202.55%.

This argument, of course, has some fallacies. Wyoming and Nebraska, which impose no income tax, have attributed to them 26.88% of the income. Furthermore, under the stipulation, the taxpayer's profitable business is located within the state of Kansas by reason of the fact that it has 110 producing wells in Kansas. This is in proven fields and where oil production has been or is being developed. Its expense figures show that its wildcatting or exploration expenses are being incurred primarily in other states. Obviously, under these circumstances other states where income tax returns must be filed do not object when the taxpayer files its return under the formula method in their state. Other fallacies in the argument have already been touched upon.

In conclusion we hold as a matter of law upon the stipulated facts that each and every conclusion of law made by the district court is erroneous.

The judgment of the lower court is reversed.