595 P.2d 1212

**TIPPERARY CORPORATION, Appellant,**

v.

**NEW MEXICO BUREAU OF
REVENUE, Appellee.**

**No. 3442.**

Court of Appeals of New Mexico.

March 15, 1979.

Writ of Certiorari Denied May 1, 1979.

James H. Bozarth, Hinkle, Cox, Eaton, Coffield & Hensley, Roswell, for appellant.

Jeff Bingaman, Atty. Gen., Santa Fe, Sarah Bennett, Sp. Asst. Atty. Gen., Sante Fe, for appellee.

## OPINION

LOPEZ, Judge.

Pursuant to § 7–1–25, N.M.S.A.1978 [formerly § 72–13–39, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1975)], Taxpayer-appellant appeals a Decision and Order of Bureau-appellee's Commissioner affirming the Bureau's assessment of corporate income taxes on the sale of Taxpayer's Wyoming coal leases. The Bureau determined the proceeds from the sale to be business income under § 7–4–2 A, N.M.S.A.1978 [formerly § 72–15A–17 A, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1975)] and, accordingly, apportioned this income to New Mexico pursuant to §§ 7–4–10 through 7–4–18, N.M.S.A.1978 [formerly §§ 72–15A–25 through 72–15A–33, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp. 1975)] of the Uniform Division of Income for Tax Purposes Act (§§ 7–4–1 to 7–4–21, N.M.S.A.1978) [formerly §§ 72–15A–16 to 72–15A–36, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1975)]. We affirm.

The primary issue on appeal is whether the Commissioner's Order and Decision was arbitrary, capricious or an abuse of discretion, not supported by substantial evidence, or otherwise not in accordance with the law. Section 7–1–25 D(1), (2), (3), N.M.S.A.1978 [formerly § 72–13–39(1), (2), (3), N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp. 1975)]. If the Order and Decision is of such a nature, this Court has the power to set it aside. Section 7–1–25 D(1), (2), (3). In order to determine this issue, two secondary issues must be decided: (1) whether the gain on the sale of Taxpayer's Wyoming leases is business income as it is defined under § 7–4–2 A; and (2) whether a tax on this gain by the State of New Mexico violates the Due Process Clause or the Commerce Clause of the United States Constitution.

### I. *Facts*

Taxpayer was incorporated in 1967 as Tipperary Land Corporation under the laws of Texas. Its original purpose was to engage in agricultural business operations in Australia. It is currently engaged in business in New Mexico and several other states. In 1969, Taxpayer was involved in a reorganization. After negotiations with the other parties to this reorganization, Stoltz & Company, Inc. and Burro Pipeline Corporation, Taxpayer exchanged 990,000 shares of its common stock for the stock of Stoltz & Company, Inc., and Burro Pipeline Corporation. In addition, Taxpayer acquired from the partnership of Stoltz, Wagner & Brown, a fifty percent interest in undeveloped mineral acreage in New Mexico and Wyoming in exchange for 90,000 shares of Taxpayer's common stock. The remaining fifty percent continued to be owned by the Stoltz, Wagner & Brown partnership. The mineral interests that Taxpayer acquired in this exchange consisted of eighty coal leases in Wyoming and several uranium and sulphur leases in New Mexico. The coal leases covered 86,000 acres and a number of them consisted of a single isolated section of land surrounded

by Federal land. The sale of certain of these contiguous leases is the subject of this appeal.

In April 1974, Taxpayer and the Stoltz, Wagner & Brown partnership granted Mobil Oil Corporation an option to acquire their interest in those Wyoming coal leases covering approximately 20,000 acres. Taxpayer was to receive an advance royalty of $12,500,000 plus a retained escalating royalty of up to 2½ percent of gross coal sales. In May 1974, Mobil exercised its option and paid Taxpayer $2,660,000 and agreed to pay $9,846,000 in installments to January 15, 1980, if the leases were successfully renewed by April 1975. In April 1975, Mobil was notified that the leases had been renewed. In 1975, Taxpayer received a second payment from Mobil. Taxpayer reported the gain on the sale as nonbusiness income. On June 16, 1976, the Bureau, after conducting an audit of Taxpayer, issued an assessment classifying the gain as apportionable business income.

II. *Gain on the Sale of Taxpayer's Wyoming Coal Leases*

■ Any assessment of taxes made by the Bureau is presumed to be correct. Section 7–1–17 C, N.M.S.A.1978 [formerly § 72–13–32 C, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1975)]. In protesting the Bureau's assessment, Taxpayer has the duty to present evidence tending to dispute its factual correctness. *Champion International Corporation v. Bureau of Revenue*, 88 N.M. 411, 540 P.2d 1300 (Ct.App.), *cert. denied*, 89 N.M. 5, 546 P.2d 70 (1975); *McConnell v. State ex rel. Bureau of Revenue*, 83 N.M. 386, 492 P.2d 1003 (Ct.App.1971). Therefore, Taxpayer has the burden to overcome this presumption. *Champion International Corporation v. Bureau of Revenue, supra*; *Mears v. Bureau of Revenue*, 87 N.M. 240, 531 P.2d 1213 (Ct.App.1975).

Section 7–4–2 A reads:

A. "business income" means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acqui-

sition, management and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations;

This definition of business income can be divided into two parts: (1) transactions and activity in the regular course of the taxpayer's trade or business, and (2) situations where the acquisition, management and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations. *McVean & Barlow, Inc. v. New Mexico Bureau of Revenue*, 88 N.M. 521, 543 P.2d 489 (Ct.App.), *cert. denied*, 89 N.M. 6, 546 P.2d 71 (1975). In affirming the Bureau's assessment, the Commissioner's Decision and Order relies on both parts of the definition.

A. *The First Part of § 7–4–2 A*

At the hearings before the Commissioner and on appeal, Taxpayer argues that the gain from the sale of the coal leases falls under neither part of the definition. With respect to the first part, Taxpayer claims that the evidence supports the following conclusions:

(1) From 1969 to 1975, Taxpayer was primarily in the business of exploring, developing and processing oil and gas. During this period, Taxpayer was minimally engaged in agriculture, fishing, canning shrimp and several "hard-rock" minerals activities.

(2) Taxpayer's coal leases were acquired in order to "round out" a major reorganization in which taxpayer obtained a corporation owning oil and gas properties.

(3) Both Taxpayer and the Stoltz, Wagner and Brown partnership lacked the two essential ingredients of cash and expertise necessary to develop independently a mining operation or other viable facility. Not until after the sale of the coal leases did Taxpayer have any employee possessing any expertise in the coal area.

(4) Taxpayer never incurred expenses for a feasibility study of its coal leases nor did it accept any proposals for such studies. It never operated the leases nor were they ever used for financing purposes. The leases were acquired and held solely for investment purposes.

(5) Thus, the regular course of Taxpayer's trade or business has never included the sale of coal leases.

■ In response, the Bureau contends that the evidence supports the conclusion that Taxpayer is in the business of exploration and development of oil, gas and minerals and that the sale of the leases was in the regular course of this business. We agree.

The seminal case in New Mexico construing the first part of § 7–4–2 A is *Champion International Corporation v. Bureau of Revenue, supra.* Three construals of business income resulted from this case. Judge Sutin, the authoring judge, defined the phrase, "transactions and activity in the regular course of the taxpayer's trade or business," as:

> Business deals and the performance of a specific function in the normal, typical, customary or accustomed policy or procedure of the taxpayer's trade or business.

*Id.* at 414, 540 P.2d at 1303. Judge Sutin also concluded that, in the light of previous cases, the use to which income is put determines whether it is business income. *See Sperry and Hutchinson Company v. Department of Revenue,* 270 Or. 329, 527 P.2d 729 (1974); *Great Lakes Pipe Line Company v. Commissioner of Taxation,* 272 Minn. 403, 138 N.W.2d 612 (1965). Rejecting *Champion's* narrow view of the meaning of trade or business, Judge Wood said in his special concurrence:

> As I read § 72–15A–17A [now § 7–4–2 A], supra, it makes no difference whether the income derives from the main business, the principal business, the occasional business or the subordinate business so long as the income arises from the "regular course" of business.

*Champion, supra,* 88 N.M. at 417, 540 P.2d at 1306. Judge Wood further stated:

> [A]ll income of a business organization is not "business income"; business income must arise from the regular course of business.
>
> Pertinent in determining whether income arises from transactions in the regular course of business is "the nature of

the particular transaction" and "former practices" of the business entity. *Western Natural Gas Company v. McDonald,* [202 Kan. 98, 446 P.2d 781] supra. Also pertinent is how the income is used. *Sperry and Hutchinson Co. v. Department of Revenue, supra.*

*Id.* at 418, 540 P.2d at 1307. In my special concurrence, I grounded the definition of business income upon the legal principles developing around the unitary business concept. Based upon these principles, I ruled that the relationship of the income source to the business activities of the taxpayer determined whether income was business in nature. If the source were independent of these activities, the income was nonbusiness as defined in § 7–4–2 D, N.M.S.A.1978 [formerly § 72–15A–17 D, N.M.S.A.1953 (Repl. Vol. 10, pt. 2, Supp.1975)]. *See, e. g., Great Lakes Pipe Line Company v. Commissioner of Taxation, supra; Webb Resources, Inc. v. McCoy,* 194 Kan. 758, 401 P.2d 879 (1965); Keesling & Warren, The Unitary Concept in the Allocation of Income, 21 Hastings L.J. 42, Example 2 at 52 (1960) for guidance to the meaning of "independent." Based upon a reading of the record and the applications of the above interpretations of business income, we hold that the gain from the sale of Taxpayer's coal leases is business income as it is defined in the first part of § 7–4–2 A. In so holding, we reaffirm our agreement with the Bureau's contention that Taxpayer is in the business of exploration and development of oil, gas and minerals.

This holding is based upon the following evidence:

(1) Taxpayer's Articles of Incorporation lists as one of the purposes for which it was incorporated the engaging "*in the business of* owning, holding, buying, *selling,* leasing and otherwise acquiring and disposing of oil, gas, petroleum and *all other mineral properties of every kind, and interests and estates therein* . . ." (Emphasis added.)

(2) In 1969, Taxpayer changed its name from Tipperary Land Corporation to Tipperary Land and Exploration Corporation. The president of Taxpayer testified that

this change was done to reflect the acquisition of oil and gas properties and other mineral interests in 1969. He also testified that Taxpayer, during the period in question, was involved in mineral exploration. The record contains abundant examples of this involvement. Prior to 1971, Taxpayer was engaged in an exploration program involving Australian copper, lead and zinc. Sometime during the period in question, Taxpayer entered into an option agreement with Amoco Minerals Co. involving the exploration of Taxpayer's molybdenum and copper prospects in certain Alaskan islands. By the end of 1973, Taxpayer's mineral interests included the Wyoming coal leases, Australian bauxite and Alaskan copper. In 1975, it acquired uranium prospects in Utah and initiated core drilling on these prospects. In this same year, Taxpayer expanded its oil, gas and mineral leaseholds to 250,000 acres. Taxpayer's president testified that these leaseholds included some of the following minerals: copper, lead, zinc, tin, silver, molybdenum, nickel and antimony. After the Mobil sale, Taxpayer continued to drill on its remaining Wyoming coal acreage and in its 1974 Annual Report stated: "As a corporate objective, the Company will seek to increase its coal position as an important means of adding to its reserves for both coal conversion to natural gas and in the mining of steam coal for industry." In addition, Taxpayer stated in its 1975 Annual Report: "Looking to the future our participation in the frontier projects of coal, bauxite, and uranium should provide a broadened base for continuing revenue and earnings growth." In 1976, taxpayer acquired and operated through a wholly owned subsidiary a coal mining operation in West Virginia. Finally, in response to a question addressed specifically to mineral exploration, Taxpayer's president testified that, between 1969 & 1974, Taxpayer was interested in exploring or developing "[a]nything that we might have found that would have had commercial value . . . ."

(3) From 1969 to 1974, Taxpayer was involved in a continued effort to develop and exploit its Wyoming coal acreage and to acquire additional coal acreage. Shortly after the reorganization and acquisition of the leases, a memorandum addressed to Taxpayer's Executive Committee stated: "[I]t is imperative that we stay abreast of all technical developments pertinent to exploitation of our mineral potential. I feel this is particularly true with regard to the coal leases." Attempts to exploit the coal leases included core drilling and water drilling tests to verify the existence of coal reserves and water supplies. In 1970, inquiry was made into railroad freight rates for coal shipments from Wyoming to the Chicago area. During the same year, a report, issued after conferring with an engineering consulting firm, presented various development prospects among which were mining and selling coal from the leased properties with subsequent transition to a gas and liquefication plant or the generation of electric power. Also in 1970, Taxpayer contacted Reynold Metals about the possibility of expanding its coal interests in Wyoming. A year later, an employee of Taxpayer issued a report concerning the availability of coal lands in Utah and recommended the acquisition of a particular tract. This recommendation resulted in an offer to purchase this tract. During the same year, Taxpayer entered into negotiations with American Metal Climax (Amax) which resulted in Amax obtaining the right to drill on the Wyoming acreage in order to determine if it was interested in acquiring an option on the property. After drilling, Amax made an offer for the leases which Taxpayer rejected. In 1973, Taxpayer requested from at least two companies proposals for feasibility studies concerning the possibilities of developing the coal leases. Shortly thereafter, it entered an option agreement involving the leases with Transcontinental Gas Pipe Line Corporation (Transco). As a result of this agreement, Taxpayer received approximately $291,666. In 1972 and 1973, Taxpayer contacted various companies to propose joint ventures for the development of the coal reserves. Taxpayer's president testified that if these contacts had produced any firm commitments, Taxpayer would

have tried to get the financial backing necessary to participate in these ventures. In 1974, Mobil Oil Corporation and Taxpayer entered into an agreement resulting in the gain which is the subject of this appeal.

(4) After determining that it had neither the expertise nor capital to develop the coal acreage by itself, Taxpayer, in conjunction with its various joint venture proposals, contacted at least thirty-three companies in an effort to sell the leases. Taxpayer's only employee possessing any expertise in the coal area testified that it was general knowledge in the industry that the leases were for sale.

(5) Taxpayer's management of its leases indicates that the coal acreage was part of Taxpayer's total business enterprise. The revenues generated by the leases were used for the general operating needs of Taxpayer's various business endeavors. Taxpayer's Annual Reports for the years 1970 to 1974 list the leases as assets and state that substantially all of its assets are used to secure its long-term debt. During the period material to this case, the regular operational, managerial and executive personnel of Taxpayer conducted the effort to develop and exploit the coal properties. The expenses incurred in core and water drilling on the property and the payments of lease rentals were paid out of general funds. Taxpayer continues to pay rentals on the 66,000 acres of retained Wyoming leases.

(6) Taxpayer's management of its coal leases is consistent with the management of certain other properties owned by it. For example, Taxpayer has attempted to develop and exploit its bauxite holdings in Australia. When it was determined that such attempts were not feasible, Taxpayer continued to hold on to this property in anticipation of its future increase in value. Taxpayer's president testified that when this increase occurs, the possibility of selling these holdings to a company wishing to develop them exists. Taxpayer maintains an inventory of oil and gas interests. Some of these it develops independently or in conjunction with other companies; others are held for certain periods of time and others are disposed of. For example, in 1970, Taxpayer subleased its Alaskan oil and gas holdings and retained an overriding royalty; in 1972, it sold its Canadian oil and gas properties. Taxpayer's president testified that the revenue from such transactions is used for general operating needs.

(7) Taxpayer's Annual Reports for the years 1969 to 1975 contain numerous statements representing its Wyoming coal leases as an integral part of its business endeavors. The following is a sampling of those representations:

. . . We visualize the Company as one with steady long-term growth potential in agriculture, livestock and marine operations, coupled with exciting exposure and opportunity in the mineral resources of the Continental United States, Australia, Canada and Alaska.

Tipperary will continue to expand its search for and development of the real assets of land and minerals during the 1970's. (1969 Annual Report)

As the new year begins management foresees the opportunity for a dramatic increase in the value of your Tipperary investment as the Company expands it activities in oil and gas exploration, coal, gas processing and other related energy projects. (1973 Annual Report)

Tipperary has 175,000,000 tons of strippable coal under its remaining 66,000 acres of State of Wyoming coal leases, in addition to a 2½% gross royalty on future production from the property traded to Mobil.

*We plan to use these reserves as a foundation for the expansion of Tipperary's investment in coal. Coal is America's most secure energy resource for the future.* (1975 Annual Report) (Emphasis not added.)

As stated previously, we rule this evidence supports a holding of business income under any of the interpretations of business income found in *Champion International Corporation v. Bureau of Revenue, supra.* Judge Sutin's interpretation is based upon

(1) whether the transaction was customary in the taxpayer's business and (2) the use to which the income was put. Although there is evidence that Taxpayer had never sold coal leases prior to the Mobil sale, there is substantial evidence to support the conclusions that Taxpayer is in the business of exploring and developing oil, gas and mineral properties and that it is customary for Taxpayer to dispose of its property interests through transactions similar to the Mobil sale. In addition, the fact that Taxpayer is in the business of exploring and developing oil, gas and mineral properties and Judge Wood's rejection of a narrow meaning of trade or business further supports the conclusion that the lease sale was an accustomed procedure in Taxpayer's business. Furthermore, the evidence is substantial that the monies from the Transco option agreement and Mobil sale were used for Taxpayer's general operating needs. Thus, the use test for business income has been met.

Taxpayer argues that *Sperry and Hutchinson Company v. Department of Revenue, supra,* and *Commonwealth v. ACF Industries, Incorporated,* 441 Pa. 129, 271 A.2d 273 (1970) stand for the proposition that, not use, but need is a major consideration in determining the nature of the income, i. e. only if the income is needed for future business activity, is it business income. We do not agree with Taxpayer's reading of these cases; rather we conclude that the decisions in these cases were based more on the use to which the income was put than the business need for it. In reaching this conclusion, we are aware that the *ACF* court did not agree that the use of the proceeds from the sale of stock for general business purposes justified taxing the sale. However, in this case, the use of the proceeds did not justify taxation because (1) there was no other use available for the proceeds once ACF ruled out the possibility of a corporate acquisition or merger with the company whose stock it sold and (2) there was no evidence that "this asset—the stock—was used in any way which contributed to ACF's business . . . ." *Id.* 271 P.2d at 281. These two facts are not present in the case at hand and, therefore, *Commonwealth v. ACF Industries, Incorporated, supra,* is not controlling.

Taxpayer argues that the gain on the Mobil sale is not business income because the evidence supports the conclusion that it is not in the business of selling coal leases. A similar argument was made by the taxpayer in *Champion.* As indicated before, Judge Wood rejected this argument and stated that such a narrow view of business "is not supported by the *wording* of UDITPA." *Champion,* 88 N.M. at 417, 540 P.2d at 1306. We agree and rule that Taxpayer's argument is without merit. Central to Judge Wood's interpretation of business income was that the income arise from the regular course of business. Judge Wood listed three pertinent considerations in making this determination. We conclude that, when the evidence is viewed in light of these considerations, there is substantial support to make the determination that the gain on the Mobil sale is business income.

The nature of the Mobil sale is similar to Taxpayer's management of its oil and gas interests. Some of these interests it develops independently or with other companies. Although the evidence indicates that Taxpayer could never develop the coal leases independently, there is evidence which supports its willingness to enter into joint ventures. Taxpayer sometimes holds its oil and gas interests and, at other times, it disposes of them. Examples of this are Taxpayer's sublease of its Alaskan oil and gas holdings in 1970 and the sale of its Canadian properties in 1972. The Mobil sale follows this pattern of holding an interest and then disposing of it. The sale is also similar to the former practices of Taxpayer. These practices include acquiring property containing potential development, researching alternative potentials and then acting upon the results of this research. Examples of these practices are the management of Taxpayer's bauxite holdings and its interest and motives in acquiring additional coal acreage in Wyoming and Utah and other mineral properties in general. Finally, the revenues from the Transco

option agreement and Mobil sale were used for Taxpayer's general operating needs. Thus, because these revenues were so used and because the Mobil sale is similar in nature to Taxpayer's management of its oil and gas interests and its former practices in the mineral area, we hold that the sale was in the regular course of business and is, therefore, business income.

In addition, by rejecting Taxpayer's narrow view of the meaning of trade or business, we have necessarily concluded that Taxpayer's management and sale of the coal leases were not independent of its other business endeavors. This conclusion is supported by a reading of Taxpayer's Annual Reports for the years 1969 to 1975, by the use of the revenues from the Transco option agreement and the Mobil sale itself and by the use of the coal acreage as security for Taxpayer's long-term debt. Supporting evidence also includes the facts that (1) expenses to research the development potential of the coal interests and to maintain Taxpayer's hold on these interests were paid out of general funds and (2) the effort to develop and exploit these interests was conducted by Taxpayer's regular personnel. Thus, the management and maintenance of the coal leases were interrelated with Taxpayer's general endeavors and these endeavors were, in turn, benefitted by the revenues generated from the coal acreage. Furthermore, this acreage was not an isolated mineral holding of Taxpayer but part of a larger mineral inventory. In such a situation, we hold that the Mobil sale was not independent of Taxpayer's other business efforts and, thus, the gain from the sale is business income under my interpretation of this term.

In holding that the gain from the sale of Taxpayer's coal leases is business income under the first part of § 7–4–2 A as it has been variously interpreted, we are aware that the Mobil payments were treated as non-recurring income for financial reporting purposes and that this treatment was determined by Taxpayer's certified public accountants to be consistent with generally accepted accounting principles.

Taxpayer argues that this treatment indicates that the Mobil sale was not a typical part of its business. The implication of this argument is that Taxpayer's business is limited to the exploration and development of oil and gas. However, for the purposes of taxation, this treatment is not dispositive in determining the nature of Taxpayer's business. *Cf. Butler Brothers v. McColgan, Franchise Tax Commissioner of California,* 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991 (1942). In addition, we note that Taxpayer's accountant testified that the treatment of income as recurring or non-recurring is based upon the accountant's opinion of the nature of the business, the circumstances of each transaction and a concept called "materiality." This concept was defined by Taxpayer's accountant as a variable which, depending upon an item's impact on the trend of earnings, contributes to determining the treatment of the income generated by the item. From this testimony, it is apparent that the treatment of income as recurring or non-recurring is dependent upon various subjective factors. We choose not to decide the nature of a business based upon an accounting procedure involving such factors. Furthermore, we note that the income from the Transco option agreement was listed in Taxpayer's 1974 and 1975 Annual Reports under general revenues and in the 1975 Annual Report under non-recurring income. This conflict in treatment reaffirms our decision not to decide the nature of Taxpayer's business based upon this accounting procedure.

### B. *The Second Part of § 7–4–2 A*

Taxpayer argues that the gain received from the Mobil sale is not business income as it is defined in the second part of § 7–4–2 A. The Bureau contends that the gain is business income under this part. Since we hold that the gain is business income under the first part of § 7–4–2 A, we are not compelled to decide whether it is business income under the second part. *See McVean & Barlow, Inc. v. New Mexico Bureau of Revenue, supra.* Accordingly, we make no decision regarding this issue. However, we note that, under this part of

§ 7–4–2 A, Taxpayer argues that it did not liquidate its coal business in 1974 since it had never been in the coal business. Taxpayer ingeniously claims that it first got into the coal business in 1976 when it acquired and began mining coal properties in West Virginia and acquired an employee with expertise in the coal area. This claim is without merit. The evidence clearly shows that Taxpayer is in the business of gas, oil and mineral exploration and development. The sale of its coal leases was part of this business. Taxpayer's argument is based upon a narrow meaning of trade or business. Such a meaning has been rejected in New Mexico. *Champion International Corporation v. Bureau of Revenue, supra.*

III. *Taxing the Gain and the Due Process and Commerce Clauses*

■ Taxpayer argues that a tax on the gain from the Mobil sale by the State of New Mexico violates the Due Process or Commerce Clauses of the United States Constitution. Taxpayer's argument is based upon its contention that this gain is not business income under § 7–4–2 A but instead is nonbusiness income under § 7–4–2 D. Because it is nonbusiness income, Taxpayer claims that it is not apportionable to New Mexico under the Uniform Division of Income for Tax Purposes Act (UDITPA). Taxpayer concludes that any New Mexico taxation of the gain, therefore, violates the Due Process or Commerce Clauses. Essentially, Taxpayer is arguing that New Mexico is taxing an out-of-state activity and because this taxation is not justified under UDITPA, it violates federal law. While making this argument, Taxpayer concedes that it is a unitary business.

The Bureau claims that Taxpayer's objections are not valid since Taxpayer is a unitary business and the gain from the Mobil sale is business income under § 7–4–2 A. Because of this situation the Bureau contends that New Mexico's taxation of the gain under the UDITPA apportionment formula is justified since the tax is only on that portion of Taxpayer's income that fairly represents the extent of Taxpayer's business activities in New Mexico. Therefore, the Bureau concludes that the tax is not violative of the Due Process or Commerce Clauses. We agree.

Taxpayer concedes that it is a unitary business. Since it makes this concession, there is no need to analyze Taxpayer's business according to the legal principles developing around the unitary business concept. We agree with Taxpayer's characterization of its business. *See Commonwealth v. ACF Industries, Inc., supra; Great Lakes Pipe Line Company v. Commissioner of Taxation, supra; Webb Resources, Inc. v. McCoy, supra; Superior Oil Company v. Franchise Tax Board,* 60 Cal.2d 406, 34 Cal.Rptr. 545, 386 P.2d 33 (1963); *Edison California Stores, Inc. v. McColgan,* 30 Cal.2d 472, 183 P.2d 16 (1947); *Butler Bros. v. McColgan,* 17 Cal.2d 664, 111 P.2d 334 (1941); Keesling & Warren, The Unitary Concept in the Allocation of Income, *supra;* Rudolph, State Taxation of Interstate Business: The Unitary Business Concept and Affiliated Corporate Groups, 25 Tax L.Rev. 171 (1970).

Since Taxpayer's business is unitary and since we hold that the gain from the sale of its coal leases is business income under § 7–4–2 A, New Mexico, as a party to the Multistate Tax Compact, can tax a percentage of this income under UDITPA. *Champion International Corporation v. Bureau of Revenue, supra; see generally Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959); *Norfolk & Western Railway Co. v. North Carolina, ex rel. Maxwell, Commissioner of Revenue,* 297 U.S. 682, 56 S.Ct. 625, 80 L.Ed. 977 (1936); and *Bass, Ratcliff & Gretton, Limited v. State Tax Commission,* 266 U.S. 271, 45 S.Ct. 82, 69 L.Ed. 282 (1924). Taxpayer has not attacked the UDITPA apportionment formula as unfair. We, therefore, sustain New Mexico's taxation of the gain under this formula. *See Hans Rees' Sons, Incorporated v. North Carolina,* 283 U.S. 123, 51 S.Ct. 385, 75 L.Ed. 879 (1931). Thus, we hold that Taxpayer's constitutional arguments are groundless and that the tax on the gain by the State of New Mexico does not violate the Due Process or Commerce Clauses of the United

States Constitution. We further hold that, after reading the record and considering the legal arguments of the parties, the Commissioner's Order and Decision, insofar as it is based on the first part of § 7–4–2 A, was not arbitrary, capricious or an abuse of discretion, was supported by substantial evidence and was otherwise in accordance with the law.

Based upon the foregoing, the Commissioner's Order and Decision is affirmed.

IT IS SO ORDERED.

WALTERS and ANDREWS, JJ., concur.